Roy L. MARTIN, Plaintiff-Appellee,

v.

XARIN REAL ESTATE, INC. and Loren Baxter, Defendants-Third-Party Plaintiffs-Appellants,

v.

G.M. RICHARDS & CO., INC. and Gerald M. Richards, Third-Party Defendants.

No. 81–1261.

United States Court of Appeals, Fifth Circuit.

April 25, 1983.

Branton & Mendelsohn, Inc., Les Mendelsohn, Alan E. Warrick, San Antonio, Tex., for defendants-third-party-plaintiffs-appellants.

Emerson Banack, Jr., Ronald B. King, Scott Breen, San Antonio, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, GEE and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal in a Texas law diversity suit from a judgment for appellee for liquidated damages incurred as a result of appellant's breach of contract. The primary question is whether a contract was made between appellant and appellee. Following a bench trial, the district court found that an enforceable, executory contract was entered into by the parties, and that appellant breached it. We affirm the district court's judgment.

## I.

Appellee Roy L. Martin ("Martin") is a shopping center developer, who owns several shopping centers. In 1975, Martin suffered a heart attack, and he decided to sell some of his shopping centers, including one located in Conroe, Texas, which is the subject of this lawsuit.

Martin first tried to sell the Conroe shopping center to Louis O. Satterfield in 1975. The sale, however, did not go through, and Martin sued Satterfield for damages for breach of contract. This lawsuit remained pending in March and April of 1978. In 1977, Martin attempted to sell the shopping center to G.M. Richards & Company, Inc., a California corporation, whose president was Gerald M. Richards ("Richards"). Appellant Xarin Real Estate, Inc. ("Xarin"), a California real estate brokerage corporation with its principal place of business in San Francisco, acted as Richards's broker. A contract was signed by Martin and Richards, but Richards failed to agree to certain changes made to the contract by Martin after its execution, and Richards also failed to make the earnest money deposit called for in the contract. The sale was not consummated, and Martin considered suing Richards, but he never did.

In 1978, Martin retained a broker, Steve Brown of Oakdell Realty Company, to procure a buyer for the shopping center.[1] Brown had also acted as Martin's broker in 1977, when the attempted sale to Richards occurred.

Brown contacted Xarin's president, Loren Baxter ("Baxter"), and told him that the shopping center was again available for sale. Baxter then contacted several prospective purchasers, among them Richards, who still wanted to buy the property. Because of a personality conflict between Martin and Richards, arising out of the aborted 1977 sale, Richards told Baxter that he did not want his (Richards's) name mentioned in connection with an offer to purchase the shopping center until it was accepted. Baxter therefore asked Brown not to mention to Martin that Richards was a potential purchaser of the shopping center.

Baxter and Byron Webb,[2] an employee of Martin's, acting through Brown, negotiated

---

1. Martin's commission agreement with Oakdell Realty was oral.

2. Webb handled for Martin all negotiations respecting the sale of Martin's properties. Martin would not become involved in a transaction

a contract which was introduced into evidence and referred to at trial as the "California contract." When the "California contract" was presented to Martin, however, he rejected it and submitted instead a contract prepared by his law firm. This contract was acceptable to Baxter, and Baxter, in his capacity as president of Xarin,[3] signed the contract on March 21, 1978. This contract obligated Xarin to pay $750,000 for the shopping center.

The contract made no reference to any buyer other than Xarin. Although Martin knew that Xarin was buying the shopping center, at least in part for someone else, Xarin never revealed the identity of its principal to Martin or to Webb until several weeks after Baxter signed the contract. In compliance with Baxter's request, Brown did not tell Martin or Webb of Richards's involvement in the transaction.

Paragraph VIII of the contract provided that "[s]imultaneously with the execution hereof, [Xarin] has deposited as earnest money with [Universal Title Company of Conroe, Texas] the sum of $50,000.00 in cash." The contract, however, was sent to Martin for his signature without the earnest money having been deposited with the title company, because Richards did not have the money when Baxter signed the contract. Richards assured Baxter that he would wire the funds to the title company, but later he told Baxter that he was going to send a check. Richards also asked Baxter for an extension of time in which to

send the check. The evidence suggests that Richards was trying to put together a syndicate to finance the purchase, and that he needed more time to do this.

Martin refused to sign the contract until the earnest money was deposited with the title company. In compliance with Richards's request, Xarin sought and obtained from Martin two extensions of time in which to make the deposit.[4] Although the evidence is unclear, it appears that on April 6, 1978, Brown received from Xarin a check for $50,000 drawn on Richards's personal bank account.[5] There was no name printed on the check, and Brown testified that he could not read the signature. Brown informed Webb that the earnest money deposit had been received without telling him that it was made with a personal check. Upon learning of the receipt of the earnest money deposit, Martin signed the contract on Friday, April 7, 1978, and that same day he had Brown deliver the contract, the extension agreement, and the earnest money deposit to the title company.

Brown arrived at the title company about 4:00 p.m. He told its bookkeeper that there were insufficient funds in Richards's account to cover the check, but he asked her to call the drawee bank, the Bank of America of Foster City, California, to verify it. The bookkeeper could not make out the name of the drawer, but she called the bank, gave the personnel there the account number, and learned that the check was

until the contracts of sale were ready for his signature. In the transaction with Xarin, Brown's contacts with Martin were through Webb.

3. Baxter was named as a defendant in Martin's suit against Xarin. Martin, however, abandoned his claim against Baxter during the trial.

4. Plaintiff's Exhibit No. 3, which was introduced into evidence, recites an agreement to extend the time for removing contingencies. The date on the agreement was originally April 5, 1978, but it was later changed by Martin to April 7. Martin made the change after talking to Baxter. Both extensions were made before the contract expired. Xarin argues that it did not agree to the second extension, but Plaintiff's Exhibit No. 11 supports Martin's testimony that the extension was in fact agreed to by

Baxter. That exhibit is a letter dated April 4, 1978, written on Xarin's stationery and signed by Baxter which recites that the time for removing the conditions of Paragraph IV of the contract was extended to April 10, 1978. Baxter testified that this letter was dictated by Richards, but he did not know if it was actually sent. Moreover, the conditions of Paragraph IV had been satisfied before March 28, 1978, and the extension was for the earnest money deposit only.

5. Brown testified that the earnest money deposit was sent by Xarin to the title company. There was testimony by the title company's personnel, however, that they received the deposit from Brown. Webb also testified that Brown received the deposit on April 6, 1978.

indeed hot. Brown then told her that funds to cover the check would be deposited on Monday, April 10, 1978. The title company deposited the check on Tuesday, April 11, 1978. The check, however, was returned unpaid on April 23, 1978, because there were still insufficient funds in Richards's account to cover it.

After the check bounced, the title company notified Xarin and Martin by letter of April 26, 1978, that "the $50,000 draft dated March 30, 1978, and deposited by us on April 11, 1978, has been returned for insufficient funds." This notice did not reveal that the "draft" had been drawn on Richards's account.[6] Martin asked Xarin to make the check good, and Xarin turned to Richards, who assured Xarin that the check would be made good, and that he would indemnify Xarin for any losses incurred as a result of the earnest money obligation or because of the contract. Richards, however, never made the check good, and the sale was not consummated. Xarin attempted to find another purchaser, but its search was unsuccessful. Xarin never notified Martin that it was cancelling the contract.

In September 1978, Martin sold the shopping center to Charles Carleton for $650,-000, and on October 10, 1978, Martin sued Xarin in the state district court of Bexar County, Texas, to recover the amount of the earnest money deposit which, under Paragraph VIII,[7] served as liquidated damages. Xarin removed the case to the federal district court of the Western District of Texas based on its diversity jurisdiction, and filed a third-party claim against Richards and his company seeking indemnity.

After a bench trial, judgment was rendered for Martin against Xarin for $50,000 plus costs and interest, and for Xarin against Richards for the same amount. Richards never appeared at trial, and he has not appealed the judgment rendered against him to this Court.[8]

II.

■ Xarin's first contention is that an enforceable contract was never made between it and Martin. Xarin argues that the deposit of earnest money was a condition precedent to the formation of the contract, a condition which Xarin says was never satisfied because the deposit was made by personal check rather than "in cash," or by a certified or cashier's check, as contemplated by the contract. Alternatively, Xarin argues that the deposit of a personal check was a counteroffer which Martin never accepted.

The district court found that the deposit with the title company of the personal check was intended by Xarin to satisfy, and as it was accepted did in fact satisfy, the provisions of Paragraph VIII respecting the manner and timing of the making of the earnest money deposit insofar as those provisions might be conditions precedent to formation of the contract. The court therefore concluded that a valid and binding contract was made by the parties. We agree.

---

6. Afterward, Martin asked the title company to send a photocopy of the check, which it did by letter of May 4, 1978. This letter was introduced into evidence as Plaintiff's Exhibit No. 4.

7. Paragraph VIII provides:
   "EARNEST MONEY AND DEFAULT
   "Simultaneously with the execution hereof, Buyer has deposited as earnest money with the aforesaid title company the sum of $50,-000.00 in cash. In the event Buyer should default in its obligations hereunder, Seller may, at Seller's option, declare forfeited as liquidated damages the earnest money, the full amount thereof to go to Seller, or Seller may enforce specific performance. In the event Seller should default in Seller's obliga-

tions hereunder, Buyer may seek its damages at law or enforce specific performance. In the event Seller should elect to declare forfeited the earnest money as aforesaid and the title company should refuse to deliver the same to Seller, then Seller shall be entitled to recover from Buyer reasonable attorney's fees incurred in securing the forfeiture of such earnest money and the title company shall not be entitled to any attorney's fees by reason of interpleader or otherwise."

8. Part of the transcript of the trial was lost by the court reporter. The parties each filed statements of evidence pursuant to Fed.R.App.P. 10(c).

In *Hudson v. Wakefield,* 645 S.W.2d 427 (Tex.1983), the parties entered into a written contract for the sale of a 186-acre tract of land. Article VII of this contract provided as follows:

### "Escrow Deposit

"For the purpose of securing the performance of Purchaser under the terms and provisions of this agreement, Purchaser has delivered to Freestone County Title, Fairfield, Texas, the sum of $5,000.00, the Escrow Deposit, which shall be paid by the title company to Seller in the event Purchaser breaches this agreement as provided in Article IX hereof. At the closing, the Escrow Deposit shall be paid over to Seller and applied to the cash portion of the purchase price." 645 S.W.2d at 429.

Article IX provided:

### "Breach by Purchaser

"In the event Purchaser should fail to consummate the purchase of the property, the conditions to Purchaser's obligations set forth in Article IV having been satisfied and Purchaser being in default and Seller not being in default hereunder, Seller shall have the right to (1) bring suit for damages against Purchaser; or (2) receive the Escrow Deposit from the title company, such sum being agreed on as liquidated damages for the failure of Purchaser to perform the duties, liabilities and obligations imposed upon it by the terms and provisions of this agreement, and Seller agrees to accept and take said cash payment as its total damages and relief and as Seller's sole remedy hereunder in such event." *Id.* at 429.

The purchaser made the $5,000 earnest money deposit with a personal check. The title company deposited the purchaser's check for collection, and it was later returned unpaid because of insufficient funds. In the meantime, the seller had attempted to sell the land to another. The purchaser then sued the seller for specific performance. Shortly thereafter, the title company notified the parties that the purchaser's earnest money check had bounced. The seller then advised the purchaser that, because of the unpaid check, the contract between them was thereby terminated. The trial court granted the seller's motion for summary judgment on the ground that there was no contract since the check for the earnest money was returned for insufficient funds. The court of appeals affirmed the trial court's judgment. 635 S.W.2d 216. The Texas Supreme Court, however, reversed and remanded the case for trial. The Court stated that the issue before it was "whether the earnest money provision of the contract amounted to a condition precedent or a covenant" (footnote omitted). *Id.* at 431. The Court held that "[a] reading of the contract here leads to only one conclusion: that the earnest money was intended as a penalty for a breach, and not as a condition precedent to the contract." *Id.* at 430. The Court, thus, reversed the judgments of the lower courts and remanded the case for trial to determine "whether the return of the earnest money check because of insufficient funds was such a material breach of the contract as to warrant Seller's repudiation of same" (footnote omitted). *Id.* at 431.

Martin argues that the Texas Supreme Court's *Hudson* decision controls this issue. We agree. Here, the contractual provisions respecting the deposit and forfeiture of the earnest money to be held by the title company are substantively identical to those in *Hudson.* *See* note 7, *supra.* When Xarin signed the contract on March 21, 1978, it became contractually bound to make the earnest money deposit with the title company in Conroe, once the contract was signed by Martin.

That the earnest money deposit was made by personal check rather than by cash (or certified funds, or a cashier's check), does not, under these circumstances, mean that a contract was never formed. The provision that the earnest money deposit be made in cash (or by certified funds) was clearly not "so material to the complete agreement that it constitut[ed] a condition precedent" to the extent that the purchaser's tendering of such deposit in another

manner thereby "prevented the agreement from ever becoming a binding contract" despite waiver by the seller, for whose benefit the "in cash" provision was obviously intended. *Cowman v. Allen Monuments, Inc.,* 500 S.W.2d 223, 228 (Tex.Civ.App.—Texarkana 1973, no writ). Although the evidence supports Xarin's argument that the parties intended for the deposit to be made by certified funds or cashier's check, Martin, though angry with the title company for accepting the personal check, in effect, waived literal compliance with this provision when, after the personal check bounced, he asked Xarin to make it good. Xarin's tender of the check and its efforts to have the check made good also shows that it waived compliance with this provision insofar as it might have constituted a condition precedent to the formation of the contract. We also note that Xarin never asserted to Martin, before this suit was filed, that the failure to make the deposit by certified or cashier's check meant that no contract was formed or that Xarin's obligations under the contract were entirely conditional on the check's clearing. *See Cowman,* 500 S.W.2d at 226–27. Moreover, the provision that the form of making the earnest money deposit be "in cash," rather than by personal check, was obviously for Martin's benefit, not Xarin's, and, under Texas law, Martin had the power to accept the making of the earnest money deposit in some form other than in cash (or by certified funds, or a cashier's check). *Shaenfield v. Hall Safe & Fixture Co.,* 157 S.W. 462 (Tex.Civ.App.—San Antonio 1913, no writ); *see Smith v. Nash,* 571 S.W.2d 372, 375 (Tex.Civ.App.—Texarkana 1978, no writ).

Having tendered the check for purposes of making the earnest money deposit provided for in the contract, Xarin cannot take advantage of Martin's failure to insist that the deposit be made in the form of cash (or certified funds, or a cashier's check) to defeat the formation of the contract, since the "in cash" provision was for Martin's benefit and Martin's failure to insist on the use of that form in making the deposit was for Xarin's benefit and Xarin acquiesced in such waiver.[9]

An earnest money deposit was made here in the amount called for by the contract. That the form used by the buyer to make the deposit was different from that provided for in the contract did not prevent formation of the contract where the seller, for whose benefit the provision was made, did not insist that the form of making the deposit be strictly as called for by the contract, and the buyer did not, before the institution of suit, take the position with the seller that, because of the form used by the buyer to make the earnest money deposit, a contract never came into being or was enforceable against the buyer only if the check the buyer used to make the deposit cleared. *See Cowman,* 500 S.W.2d at 227. Xarin's ultimate failure to consummate the purchase and sale of the shopping center was a "default in its obligations" under the contract and thus gave Martin the right to declare forfeited as liquidated damages the amount of the earnest money deposit.[10]

### III.

Xarin's next contention is that even if there were an enforceable contract be-

---

9. For essentially the same reason, Xarin's argument that the extension agreements were unsupported by consideration and that the contract is therefore unenforceable must also fail. Xarin never questioned the granting of the extensions. More importantly, the extensions were made for Xarin's benefit, to give it time to make the earnest money deposit. Xarin cannot take advantage of the extensions and then maintain that the contract is unenforceable because they were unsupported by consideration. Moreover, under Texas law, consideration for the extension agreements was unnecessary since both parties waived strict compliance with the time limit. *Langley v. Norris,* 141 Tex.

405, 173 S.W.2d 454, 458 (1943); *Hage v. West-gage Square Commercial,* 598 S.W.2d 709, 711 (Tex.Civ.App.—Waco 1980, writ ref'd n.r.e.).

10. Under Tex.Bus. & Com.Code Ann. § 3.802, Richards's personal check, given to satisfy Xarin's contractual obligation to make the earnest money deposit, suspended this obligation until presentment of the check to the drawee. Once the check was dishonored, Martin had the choice of maintaining an action on either the instrument itself or on the obligation. Here, Martin chose to enforce the obligation to pay the earnest money.

tween the parties, Martin cannot seek its enforcement because he breached certain warranties, which are set forth in Paragraph III [11] of the contract. The first warranty alleged to have been breached concerns the nonpayment of the March 1978 rent by four of the twenty-one tenants of the shopping center. The second breach concerns litigation involving the shopping center alleged to have been pending in March and April of 1978.

■ In Texas, a party to a contract who is himself in default under the contract cannot maintain a suit for its breach. *Green v. A.R. Clark Investment Co.,* 363 S.W.2d 802 (Tex.Civ.App.—Fort Worth 1962), *rev'd on other grounds,* 375 S.W.2d 425 (Tex.1964). The district court, however, found that Martin did not breach any warranties, and this finding is not clearly erroneous.

The evidence shows that Martin wanted all of the contingencies set forth in Paragraph IV to be removed before he signed the contract. Paragraph IV [12] required that these contingencies be removed by March 28, 1978. Xarin's vice-president, Jim Foster, came to Texas on March 21, 1978, to inspect the shopping center and to examine its books and records so that the contingencies could be removed. Martin made available to Foster all the books and records that concerned the shopping center. Brown testified that Foster discussed the rent delin-

quencies, which totaled less than $3,000, with Webb, but Foster denied having such a discussion. Brown's testimony, however, supports the district court's finding that Xarin was aware of the fact that these tenants were delinquent. Furthermore, neither Foster nor anyone else with Xarin objected to Martin about the rent delinquencies until after this lawsuit was filed.

There was also testimony by Webb that it was customary in the sale of a shopping center for any delinquent rentals to be cured by the time of closing, which in this case was supposed to have occurred on or before May 15, 1978. Webb also testified that all tenants would have been current at the time of closing, and that Martin would have been in a position to close on the sale.

As to Xarin's allegation that Martin breached his warranty respecting the absence of any pending litigation concerning the shopping center, the evidence shows that the only pending, or threatened, litigation concerning the shopping center was Martin's suit for damages (not specific performance) against Satterfield for the latter's previous breach of his 1975 contract to purchase the shopping center, as to which there was no indication that Satterfield was asserting (or seeking to enforce, by counterclaim or otherwise) in any manner any current right on his part to acquire the shopping center, or that Martin was taking the

**11.** Paragraph III provides in part:
"(c) that Seller has no knowledge of any material default by tenants in any leases covering premises situated on the property;
". . . .
"(g) to the best of Seller's knowledge and belief, there is no pending or threatened litigation, claim, cause of action, investigation, action or legal, or administrative proceeding or real estate tax protest concerning the property and the related improvements and business, and that there are no special arrangements concerning real estate taxes now in effect.
"The warranties herein contained shall survive closing."

**12.** Paragraph IV provides:
*"Conditions*
"Buyer's obligations hereunder are expressed conditioned upon:

"(a) Buyer's review and approval of Seller's operating statements for the last two (2) years;
"(b) Buyer's review and approval of existing leases;
"(c) Buyer's on-site inspection and approval;
"(d) Buyer determining that the conveyance hereunder will violate no covenants contained in the mortgages.
"In the event the aforesaid conditions have not been fulfilled on or before ten (10) days from date hereof, then Buyer may cancel this contract by notice in writing to Seller delivered on or before the expiration of fifteen (15) days from date hereof. Failure to timely cancel, shall constitute a waiver of such conditions. Upon such cancellation, the earnest money deposited hereunder shall be returned to Buyer and neither party shall have any further obligation hereunder."

position that Satterfield any longer had any such right. This suit would not affect either Xarin's (or Martin's) title to the shopping center or anything about the center or its operation, revenues, expenses, or obligations, and hence is not the type of litigation contemplated by the warranty of Paragraph III.

We uphold the district court's determination that Martin committed no breach of warranty which under the circumstances would bar his enforcement of the contract.

## IV.

■ Xarin's next contention is that it is not primarily liable to Martin for the liquidated damages because the identity of its principal, Richards, was disclosed to Martin. Xarin argues that Martin's broker, Brown, knew that Richards was the true purchaser, and that Brown's knowledge was imputed to Martin. We disagree.

> " 'It is the duty of the agent, if he would avoid personal liability on a contract entered into by him on behalf of the principal, to disclose not only the fact that he is acting in a representative capacity but also the identity of his principal, as the person dealt with is not bound to inquire whether or not the agent is acting as such for another.' 2 C.J. 816, § 49.
>
> " . . . .
>
> " 'It is sufficient to relieve the agent from liability, if the disclosure of the fact of the agency and the identity of the principal is made before or at the time the contract is entered into, or before liability is incurred on either side. But a disclosure made after the transaction has been practically *brought to a close* (emphasis ours) and liabilities incurred, comes too late to relieve the agent from liability.' Id. 818, § 493." *Mahoney v. Pitman,* 43 S.W.2d 143, 146 (Tex.Civ.App.—Amarillo 1931, writ ref'd).

The district court found that Baxter told Brown not to mention to Martin that Richards was involved in the purchase; that Brown did not definitely know that Richards was the real party buying the shopping center, even though his name had been mentioned as being involved; and that Martin did not know that Richards was the real party buying the property until after the contract had been breached.

The evidence shows that Martin knew that Xarin was buying the property, at least in part, for someone else, but that he did not know the identity of Xarin's principal. The evidence also shows that Baxter told Brown that Richards was one among several potential buyers, and that Baxter asked Brown not to mention Richards's involvement to Martin. Although the evidence indicates that Brown may have believed that Richards likely was a purchaser at least when Richards's personal check for the earnest money deposit was received, Brown never reported this fact to Webb or to Martin. Brown himself testified that he was never really sure who the real purchaser or purchasers were.

More significantly, even if Brown knew that Richards was Xarin's principal, this knowledge would not have been imputed to Martin.

> "The rule imputing notice is based upon the theory that it is the duty of the agent to communicate to his principal the knowledge possessed by him relating to the subject matter of the agency, material to the principal's protection and interest, and the presumption that he has performed his duty, Mechem On Agency (2d Ed.) § 1815, p. 1399, and also upon the fiction of the legal identity of principal and agent. 2 C.J. § 542, pp. 859–862. *This rule does not prevail where the conduct of the agent is such as to raise a clear presumption that he would not communicate the facts to his principal.* 21 R.C.L. § 24, p. 843; 2 C.J. § 542, p. 863; Mechem On Agency, supra." *Brady v. Garrett,* 66 S.W.2d 502, 505 (Tex.Civ.App.—El Paso 1933, writ dism'd) (emphasis added).

Brown complied with Baxter's request that he not reveal Richards's involvement to Martin, and in doing so, Brown acted adversely to the interests of his principal, Martin. Baxter's reliance on Brown to keep Richards's involvement a secret proved

well-founded. "Clearly, where the agent and third party agree to conceal certain information from the principal, the principal will not be bound by the agent's knowledge." *Sell on Agency,* § 92 at 79 (1979). Under these circumstances, even if Brown had known that Richards was Xarin's principal, his knowledge would not have been imputed to Martin.

There is also another reason why Xarin is liable on the contract. Nothing in the contract shows or gives the impression that Xarin is acting as agent for another; rather, the contract negates any such impression. Where, as here, a written contract is signed in the name of a party who happens to be acting as an agent, but the contract gives no indication that any agency exists or that the party is signing other than as a principal or with any qualifications, the agent is bound even though the other contracting party knows the identity of his principal. *Queiroli v. Whitesides,* 206 S.W. 122, 123 (Tex.Civ.App.—San Antonio 1918, no writ); *American Nat. Bank v. American Loan and Mortgage Co.,* 228 S.W. 169, 171 (Tex.Comm'n App.1921, jdgmt adopted); *American Petrofina Company of Texas v. Bryan,* 519 S.W.2d 484, 487 (Tex. Civ.App.—El Paso 1975, no writ). *See also John Minder & Son v. L.D. Schreiber Co.,* 73 F.Supp. 477, 480–81 (S.D.N.Y.1947). In such a case, parol evidence is inadmissible to show that it was the intention of the parties thereto that the agent not be personally bound, for such evidence would contradict the written contract.[13] *Queiroli,* 206 S.W. at 123; *American Petrofina,* 519 S.W.2d at 487; *Rest. Agency 2d* § 323 (1958). *See also Heffron v. Pollard,* 73 Tex. 96, 11 S.W. 165, 166 (1889); *Cavaness v. General Corp.,* 155 Tex. 69, 283 S.W.2d 33, 37 (1955). Thus, under Texas law, Xarin was personally liable on the contract, and it could not have proved a contrary intention.

V.

Xarin's final contention is that Martin is estopped by his conduct from recovering the liquidated damages. Xarin argues (1) that Martin was required to formally declare, presumably in writing, that the earnest money was forfeited, and that his failure to do so constituted a waiver of his right to liquidated damages, and (2) that because Martin sold the property to Carleton, he elected not to recover liquidated damages. We disagree with both arguments.

Nothing in the contract required Martin to give notice of forfeiture in any particular manner or prevented Martin, several months after Xarin's breach, from selling the shopping center and then suing Xarin for liquidated damages. Under the contract, Martin had an election to sue Xarin for specific performance or for liquidated damages.

The district court's judgment is affirmed. AFFIRMED.

---

13. In Texas, the Parol Evidence Rule is not a rule of evidence, but one of substantive law. *Hubacek v. Ennis State Bank,* 159 Tex. 166, 317 S.W.2d 30, 32 (1958). We also note that here there was no finding, nor does the evidence compel a finding, of facts which would justify reformation or rescission of the contract, or even that Martin and Xarin agreed that Xarin would not be obligated on the contract.