IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-20270
_____


AMERICAN INSURANCE COMPANY; UNDERWRITERS AT LLOYD'S LONDON;
AMERICAN HOME ASSURANCE COMPANY,

                                    Plaintiffs-Appellants,

        versus


ASSICURAZIONI GENERALI S P A; ET AL,

                                    Defendants,

ASSICURAZIONI GENERALI S P A,

                                    Defendant-Appellee.


_____

Appeals from the United States District Court
for the Southern District of Texas
H-93-CV-1801
_____
July 24, 2000

Before GARWOOD, WIENER, and DENNIS, Circuit Judges.[*]

GARWOOD, Circuit Judge:

        Plaintiffs-appellants American Insurance Company, Underwriters at

Lloyd's London, and Home Assurance Company (collectively, the Excess

Carriers) filed suit in Texas state court against Assicurazioni Generali

_____

        [*]Pursuant to 5TH CIR. R. 47.5 the Court has determined that this
opinion should not be published and is not precedent except under the
limited circumstances set forth in 5TH CIR. R. 47.5.4.

SpA (Generali)[1], alleging that Generali violated its duty under the *Stowers* doctrine, which requires an insurer to accept a reasonable settlement offer within policy limits or bear any resulting loss greater than policy limits. The Excess Carriers claimed that Generali's failure to accept a reasonable settlement offer in an underlying personal injury suit caused them to sustain substantial losses from an eventual settlement in excess of Generali's policy limits. Generali removed this action to federal court on the basis of diversity jurisdiction. The district court granted summary judgment in favor of Generali. The Excess Carriers appeal, and we now reverse and remand.

## Factual and Procedural History

Parker & Parsley Petroleum Company (Parker & Parsley) served as a general partner of a partnership that leased and operated a natural gas well in the San Juan Basin of New Mexico. Parker & Parsley was designated as "operator" of the project. On September 20, 1990, the well exploded, severely burning three employees of a subcontractor servicing the wellsite, George Valencia, David Cupps, and Jeffrey Hinger (collectively, the Hinger plaintiffs). After recovering workers' compensation benefits from their employer, the Hinger plaintiffs in February 1991 filed suit in New Mexico state court against Parker &

---

[1] The Excess Carriers had also named Gay & Taylor, Inc., Thomas Howell Group Americas, and J.G. Reynaud as defendants in this action. The claims against these defendants were later dismissed, and the Excess Carriers have not appealed their dismissal. Therefore, those claims are not before this Court.

Parsley, Evergreen Resources, Inc.,[2] and certain subcontractors. The subcontractors settled before trial.[3] Parker & Parsley and Evergreen Resources proceeded to trial.

Parker & Parsley carried a $1 million primary insurance policy issued by Generali and a $20 million excess policy issued by the Excess Carriers.[4] Generali's primary policy required Generali to defend any suit against Parker & Parsley and reserved for Generali the right to make such investigation and settlement of any claim or suit it deemed appropriate.

The Hinger plaintiffs' suit against Parker & Parsley and Evergreen Resources proceeded to trial on November 4, 1992, and ended on December 11, 1992. During a recess on November 10, 1992, the Hinger plaintiffs presented the following written settlement demand:

> "Plaintiffs are willing to fully settle this case with Defendants, Parker & Parsley Petroleum Co. and Evergreen Resources, Inc., on the following terms:
>
> (1) Payment of the sum of $986,000.00 or the remaining primary limits of your clients' insurance coverage, whichever is less[5];

---

[2] Evergreen Resources, a co-general partner of Parker & Parsley, was also insured under the policies issued by Generali and the Excess Carriers.

[3] Halliburton Company settled for $736,000, Wellhead Services, Inc. for $514,000, and Sam Billington/Drew Bates Consulting Company for $950,000.

[4] American Insurance Company held fifty percent of the excess policy, Underwriters at Lloyd's London twenty-five percent, and American Home Assurance Company twenty-five percent.

[5] Generali had already paid $14,000 to a fourth burn victim, who was not a party to the Hinger suit.

> (2) Release and conveyance to Plaintiffs of any interest which you may have in the model wellhead and BOP[6];
>
> (3) The settlement shall be confidential; and
>
> (4) We reserve the option to have some portion of the funds put into a structured settlement to be placed through Larry Ward & Associates. We will advise you within forty-eight (48) hours of your acceptance what portion will be structured.

This offer expires at 12:00 noon on November 11, 1992."[7] The Hinger plaintiffs' offer was received at approximately 1:20 p.m. on November 10, 1992, by W.R. Logan (Logan), the New Mexico attorney defending Parker & Parsley and Evergreen Resources. Logan then transmitted the offer at 4:00 p.m. on November 10, 1992 to J.G. Reynaud (Reynaud), the Director of Non-Marine Claims at Gay & Taylor, Inc., an Atlanta company that served as the third-party claims administrator for Generali. In July 1992, Generali had authorized Reynaud to settle the Hinger suit within Generali's policy limits of $1 million.

Upon receiving the Hinger plaintiffs' offer, Reynaud and separate counsel began analyzing the claim and, on the morning of November 11, 1992, flew to Albuquerque to review defense files and

---

[6] A BOP, or blowout preventer, is a well-known safety device for working on gas wells like the one at issue in the Hinger suit.

[7] After two days of trial testimony, the Hinger plaintiffs made the offer, because David Cupps, the most seriously injured of them, did not believe he was physically and emotionally capable of sitting through the remainder of the trial.

4

interview Logan regarding the trial's status. During this meeting in Albuquerque, Logan recommended to Reynaud that the offer be accepted. Reynaud did not accept the offer by the noon deadline, and it expired. Before trial proceedings began on the morning of November 13, 1992, Reynaud offered the Hinger plaintiffs $110,000 to settle the suit; by its terms, this offer expired when court recessed that day. The Hinger plaintiffs rejected Reynaud's offer.

At the conclusion of the trial, the jury found Parker & Parsley and Evergreen Resources liable for the explosion, allocating ninety percent of the responsibility to Parker & Parsley, nine percent to Evergreen Resources, and one percent to Sam Billington. The jury found no fault on the part of the Hinger plaintiffs or the subcontractors. On December 21, 1992, the Hinger plaintiffs obtained a judgment against Parker & Parsley and Evergreen Resources on the jury's verdict for an amount in excess of $12 million, including approximately $5 million in compensatory damages and $7 million in punitive damages.[8] The trial court later amended the judgment to account for a settlement credit of $2.2 million; however, this credit was eliminated on appeal. Following appeal, the Hinger suit was settled for almost $16 million with the Excess Carriers funding approximately $15 million.

---

[8] According to Logan, this verdict set a record for the amount of damages awarded by a jury in New Mexico state district court in Albuquerque. For a more complete description of the New Mexico suit, see *Hinger v. Parker & Parsley Petroleum Co.*, 902 P.2d 1033 (N.M. Ct. App. 1993).

The Excess Carriers subsequently filed suit against Generali in Texas state court, alleging, *inter alia*, that Generali violated its duty under the *Stowers* doctrine to reasonably settle the Hinger suit within primary policy limits when it rejected the Hinger plaintiffs' November 10, 1992 offer. Generali then removed this action to federal court on the basis of diversity jurisdiction. After removal, Generali moved for summary judgment on the following grounds: (1) that the period of time to accept the November 10, 1992 offer was unreasonable; (2) that the offer's requirement that a portion of the settlement's proceeds be placed in a structured settlement rendered the offer conditional such that the *Stowers* doctrine was not triggered; and (3) that the insured consented to a trial, thereby precluding the Excess Carriers from asserting a *Stowers* claim. The district court granted Generali's motion on the basis that Generali acted reasonably, as a matter of law, in rejecting the November 10, 1992 offer. Specifically, the district court concluded that the short period of time to accept the Hinger plaintiffs' offer rendered Generali's decision to reject it reasonable as a matter of law. The Excess Carriers now appeal to this Court.

## Discussion

The Excess Carriers assert that the district court erred in

6

granting Generali judgment as a matter of law on their *Stowers* claim.[9]
We agree and reverse and remand.

We review a grant of summary judgment applying the same standard as the court below was obliged to apply. *See King v. Chide*, 974 F.2d 653, 655 (5th Cir. 1992). Summary judgment is proper when no issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See id*. at 656. The summary judgment evidence is viewed in the light most favorable to the nonmovant, in this case, the Excess Carriers, and questions of law are reviewed *de novo*. *See id*. We may affirm a judgment on any basis raised below and supported by the record. *See Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998); *Davis v. Liberty Mut. Ins. Co.*, 525 F.2d 1204, 1207 (5th Cir. 1976); *see also* 10A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2716, at 290 (3d ed. 1998).

We apply Texas law to the Excess Carriers' action.[10] When

---

[9] On appeal, the Excess Carriers also contend that Generali breached its obligations under the primary policy by failing to pay interest on the entire judgment entered in favor of the Hinger plaintiffs. Generali responds that the Excess Carriers never raised this claim before the district court and that the primary policy was not breached. In its order, the district court made no mention of a breach of contract claim. As we reverse and remand the Excess Carriers' *Stowers* action, we need not and do not address the breach of contract claim.

[10] The parties assume, without argument, that Texas law governs this action. Although the Hinger suit occurred in New Mexico, the primary policy between Generali and the insured reflects that the insured is a Texas corporation and that complaints by the insured may be addressed to the Texas Board of Insurance. Accordingly, we apply Texas law as the parties have treated it as applicable.

adjudicating a claim for which state law provides the rules of decision, we are bound to apply the law as interpreted by the state's highest court. *See Transcontinental Gas v. Transportation Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992). If the state's highest court has not spoken on a particular issue, "it is the duty of the federal court to determine as best it can, what the highest court of the state would decide." *Id*. When making such a determination, we are bound by an intermediate state appellate court decision unless "convinced by other persuasive data that the highest court of the state would decide otherwise." *First Nat'l Bank of Durant v. Trans Terr Corp.*, 142 F.3d 802, 809 (5th Cir. 1998) (internal quotations and footnote omitted). We, however, "will not expand state law beyond its presently existing boundaries." *Rubinstein v. Collins*, 20 F.3d 160, 172 (5th Cir. 1994) (footnote omitted).

Under Texas law, an insurer has a duty to accept reasonable settlement offers. This is commonly referred to as the *Stowers* doctrine. *See G.A. Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544, 547 (Tex. Comm'n App. 1929, holding approved). A settlement demand, however, does not trigger the *Stowers* duty unless three prerequisites are met: "(1) the claim against the insured is within the scope of coverage; (2) the demand is within policy limits; and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment." *State Farm Lloyds Ins. Co. v. Maldonado*, 963 S.W.2d 38, 41 (Tex. 1998); *see Texas Farmers Ins. Co.*

8

*v. Soriano*, 881 S.W.2d 312, 314 (Tex. 1994).  To impose a *Stowers* duty on an insurer, a settlement demand must propose to release the insured fully in exchange for a stated sum of money, although the term "the policy limits" may be substituted for a sum certain.  *See American Physicians Ins. Exchange v. Garcia*, 876 S.W.2d 842, 848 (Tex. 1994). The *Stowers* doctrine requires that an insurer "exercise that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business in responding to settlement demands within policy limits."  *Id*. at 848 (internal quotations omitted).  A breach of this duty gives rise to a cause of action sounding in negligence.

Although the *Stowers* doctrine arose in the context of an insured seeking a remedy against his insurer, Texas law also permits actions under the *Stowers* duty by an excess insurer against a primary insurer through the doctrine of equitable subrogation.  *See General Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 949-50 (5th Cir. 1999) (citing *American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 482-83, 485-6 (concurring opinion of Hecht, J., joined by four other justices) (Tex. 1992)).  "Equitable subrogation is the legal fiction through which a person or entity, the subrogee, is substituted, or subrogated, to the rights and remedies of another by virtue of having fulfilled an obligation for which the other was responsible."  *Id*. at 949.  Under equitable subrogation, "an excess insurer, paying a loss under a policy, 'stands in the shoes' of its insured with regard to any

9

cause of action its insured may have against a primary insurer responsible for the loss." *Id*. Accordingly, for the excess insurer to recover from a primary insurer, "the excess insurer must first prove that the primary insurer failed to fulfill a duty owed to the insured." *Id*. "In recognizing the availability of this remedy, the Texas Supreme Court reasoned that, if excess carriers were not subrogated to the claims of their insured, primary insurers would have less incentive to settle within their policy limits and might be tempted to 'gamble' with excess carriers' money when potential judgments approach the primary insurers' limits." *Id*. (citing *American Centennial Ins. Co.*, 843 S.W.2d at 483). However, Texas law neither requires the insurer to make or solicit offers to settle the claim or suit nor has extended direct duties based on the relationship between excess and primary carriers. *See id.; American Physicians Ins. Exchange*, 876 S.W.2d at 851.

Both Generali and the Excess Carriers agree that the Hinger suit fell within the scope of Generali's primary policy. Generali contends that the Excess Carriers' *Stowers* action fails for the following reasons: (1) the offer was not within the primary policy limits; (2) Generali acted reasonably in rejecting the offer; (3) the offer was conditional and therefore does not fall under the *Stowers* doctrine; and (4) the insured's consent to trying the Hinger suit to verdict defeats the Excess Carriers' *Stowers* action. We consider these issues in that order.

I   Offer Within Policy Limits

10

On appeal, Generali argues that the district court's grant of summary judgment can be affirmed on the basis that the *Stowers* doctrine was not triggered by the Hinger plaintiffs' offer as it was not within policy limits. Generali contends that the demand for the insured's interest, if any, in the blowout preventer (apparently a model trial exhibit), rendered the offer outside policy limits. In its summary judgment order, the district court noted "[p]arenthetically, [that] the offer appears to have exceeded the policy limits because it asks for the policy limits plus other transfers, but the offer is assumed to have been within the limits." "Although we can affirm a summary judgment on grounds not relied on by the district court, those grounds must at least have been proposed or asserted in that court by the movant." *Johnson v. Sawyer*, 120 F.3d 1307, 1316 (5th Cir. 1997). Generali did not move for summary judgment on this ground before the district court. Therefore, we cannot affirm the district court's grant of summary judgment on this basis.[11]

II   Generali's Reasonableness as a Matter of Law

The *Stowers* doctrine sounds in negligence, requiring an ordinarily

_____

[11] Curiously, positions taken by Generali before the district court undercut its assertion on appeal that the Hinger plaintiffs' offer was not within primary policy limits. In its motion for summary judgment, Generali stated that on "November 10-11, 1992, . . . the Hinger plaintiffs made an offer within Generali's limit." Generali's reply to the Excess Carriers' response to Generali's motion for summary judgment reiterates this position, declaring that the Hinger plaintiffs "did not . . . make a demand within Generali's policy limits[] until the afternoon of November 10, 1992"–the demand at issue in this appeal. Moreover, in his deposition, Reynaud testified that the Hinger plaintiffs' offer was within primary policy limits.

prudent insurer to accept a reasonable settlement offer or be liable for any judgment in excess of the primary policy limits, taking into "consider[ation] the likelihood and degree of the insured's potential exposure to an excess judgment." *Garcia*, 876 S.W.2d at 849. In *Garcia*, the Texas Supreme Court stated that "the *Stowers* remedy of shifting the risk of an excess judgment onto the insurer is inappropriate absent proof that the insurer was presented with a reasonable opportunity to prevent the excess judgment by settling within the applicable policy limits." *Id.* The district court interpreted "reasonable opportunity" to consist of a substantive and a procedural requirement: the former referring to the reasonableness of the terms of the offer, and the latter concerning the amount of time to either accept or reject the offer given the consequences of the decision. This analysis, although not specifically described in this manner by any Texas court, properly characterizes the appropriate inquiry. *See id.* ("In the context of a *Stowers* lawsuit, evidence concerning claims investigation, trial defense, and conduct during settlement negotiations is necessarily subsidiary to the ultimate issue of whether the claimant's demand was reasonable under the circumstances, such that an ordinarily prudent insurer would accept it."). Generali argued, and the district court concluded, that it acted reasonably as a matter of law in not accepting the Hinger plaintiffs' offer because of the short period of time allowed to accept the offer and the uncertainties involved in the possible structuring of a portion of the settlement. We disagree and hold that

12

on the instant record a genuine issue of material fact is present as to whether Generali acted reasonably.

We first consider the potential exposure to a judgment outside the primary policy limit. The Hinger plaintiffs had suffered severe burn injuries, and Logan considered that the damages finding might well run as high as $3 million, although he did not believe punitive damages were a possibility. He recommended that the settlement offer be accepted. Logan expected that the jury would apportion approximately 15-25 percent of the comparative responsibility to the insured with the remaining responsibility spread among the plaintiffs and the settling defendants. Reynaud composed a memorandum on November 9, 1992, one day before receiving the Hinger plaintiffs' settlement offer, which stated that "the verdict could exceed [Generali's $1 million] policy." Despite this possibility, Reynaud considered a $750,000 settlement to be reasonable.[12]

Nevertheless, under New Mexico law the insured likely could be held responsible for the entire loss by the Hinger plaintiffs, even if the jury apportioned 15-25 percent of the comparative responsibility to the insured. The Hinger plaintiffs argued before the New Mexico district court that the principles of *Saiz v. Belen School District*, 827 P.2d 102

---

[12]We also note that on November 7, 1992, the Albuquerque press reported the multi-million dollar settlement of a local burn victim case involving a nine year-old girl.

13

(N.M. 1992)[13], should apply, under which the insured could be held strictly liable for the entirety of the Hinger plaintiffs' losses. In October 1992, the New Mexico district court made a preliminary ruling that *Saiz* would not apply. However, the court also stated that, if the evidence adduced at trial convinced the court that *Saiz* should apply, it would revisit the issue. In fact, Reynaud testified in his deposition that, if the *Saiz* opinion applied, the insured would be responsible for the entire damage award even if apportioned only one percent of the comparative responsibility for the Hinger plaintiffs' losses.

On this record, a jury could reasonably conclude that an insurer of ordinary prudence would find the offer substantively reasonable and that a significant possibility of a judgment in excess of the primary policy limit existed.

With regard to the reasonableness of the opportunity to accept the Hinger plaintiffs' offer, Generali argues that it was not only the shortness of the period allowed to accept the offer, but also the uncertainty surrounding the structured settlement that makes its rejection of the offer reasonable as a matter of law. Admittedly, Reynaud employed independent counsel to assist him in evaluating whether or not to accept the offer, and the two worked diligently to analyze the Hinger suit and the offer, including traveling to Albuquerque to meet

---

[13] The New Mexico Supreme Court issued the *Saiz* opinion on February 21, 1992, over six months before the Hinger suit was tried.

with Logan and review defense files.  However, we cannot conclude that the present summary evidence establishes reasonableness as a matter of law.  The events forming the basis of the Hinger suit occurred two years before the offer was made, the suit had been pending over twenty months, and, several months before trial, Generali had granted Reynaud the authority to settle the Hinger suit within the primary policy limits. Jerrald Roehl, the Hinger plaintiffs' attorney (Roehl), made the offer to Logan approximately twenty-three hours before it expired.  When Reynaud received notice of the offer, twenty hours remained to accept it.  Logan recommended to Reynaud that the offer be accepted.  Moreover, the parties, including Reynaud acting on behalf of the insured, had previously attempted to mediate the Hinger suit, and the trial in the New Mexico trial court had already begun several days previously when the offer was tendered.  There is no evidence that more time to evaluate the offer was ever requested (or that the Hingers' counsel was informed such was needed) before it expired, that there was any attempt to accept the offer after it expired or that there was any reasonable possibility the offer would have been accepted had more time been allowed. Reynaud's November 13th $110,000 settlement offer to the Hinger plaintiffs reinforces this point, as he handed the offer to Roehl at the beginning of trial that day and it terminated when court recessed that day.  This certainly was a period of time less than the twenty hours Reynaud had to accept the Hinger plaintiffs' November 10th offer and the

15

amount was not even in the same ballpark as the Hingers offer.[14]

Although the issue is indeed a very close one, we conclude that on the present record whether Generali acted reasonably in not accepting the Hinger plaintiffs' November 10th offer is a fact question appropriate for a jury determination, not summary judgment.[15] The district court erred in granting Generali summary judgment on the basis that it acted reasonably as a matter of law.

III  Unconditional Offer

In its motion for summary judgment, Generali argued that the Hinger

---

[14]  We note that there is no evidence even suggesting that the offer's reference to a structural settlement provision required more time for evaluation or had anything whatever to do with the failure to accept the offer.

[15]  In finding that Generali acted reasonably as a matter of law because of the lack of sufficient time to evaluate the November 10, 1992 demand, the district court relied on *DeLaune v. Liberty Mutual Insurance Co.*, 314 So.2d 601 (Fla. Ct. App. 1975), and *Glenn v. Fleming*, 799 P.2d 79 (Kan. 1990). Neither case, however, supports the conclusion that the refusal to accept an offer within a twenty-three hour period several days into the trial of a twenty month old lawsuit (concerning an over two year old incident), in which discovery was apparently complete, mediation had been attempted, and authority to settle for policy limits had been procured, is reasonable as a matter of law. *See Glenn*, 799 P.2d at 85-86 (holding that failure to accept policy limits offer within two weeks allowed was not evidence of bad faith where "the case was less than four months old. Discovery had scarcely begun. There were several defendants . . . no report of the incident was submitted . . . [to the insurer] until suit was filed."); *DeLaune*, 314 So.2d at 602-03 (finding no negligence in refusing a policy limit offer that was open for ten days when the offer was received approximately six weeks after the occurrence of the underlying accident and only eight days after defense counsel received the file, on the tenth day, a Friday, defense counsel informed plaintiff's counsel he could likely have a response by Monday but plaintiff's counsel refused an extension, and on Monday the insurance company attempted to settle for the policy limit but plaintiff refused).

16

plaintiffs' offer was not unconditional, because it permitted the Hinger plaintiffs to place a portion of the settlement into a structured annuity.[16] Generali claims that this arrangement left open the possibility that Generali could be held liable for payments to the Hinger plaintiffs in the event that the annuity company became unable to make such payments. Generali concludes that this risk of future exposure rendered the Hinger plaintiffs' offer conditional and, therefore, did not trigger the *Stowers* duty. The district court determined that, despite being uncertain, the offer was unconditional. On appeal, Generali renews this argument. We conclude that the summary judgment evidence here does not establish as a matter of law that the Hinger plaintiffs' offer was conditional.

"Generally, a *Stowers* settlement demand must propose to release the insured fully in exchange for a stated sum of money, but may substitute 'the policy limits' for a sum certain." *American Physician Ins. Exchange*, 876 S.W.2d at 848-49. Moreover, this Court has held that the *Stowers* doctrine "does not require the insurer to accept a conditional offer carrying risks of further liability." *Danner v. Iowa Mutual Ins. Co.*, 340 F.2d 427, 430 (5th Cir. 1964); *see id*. at 429 ("There must be an unconditional offer to settle before there can be said to be a breach

---

[16] The reservation for the structured settlement states as follows:
> "We reserve the option to have some portion of the funds put into a structured settlement to be placed through Larry Ward & Associates. We will advise you within forty-eight (48) hours of your acceptance what portion will be structured."

of the insurer's duty.") (emphasis omitted). Generali claims that the Hinger plaintiffs' reservation of the right to place a portion of the settlement proceeds into a structured settlement[18] rendered the offer conditional. In support of this position, Generali relies on the deposition testimony of Don Hawley (Hawley), an associate director of major litigation claims adjustment at Fireman's Fund.[19] Hawley stated that it is his understanding that underwriters of structured settlements retain contingent risks.[20] Generali also asserts that the Hinger

---

[18] Black's Law Dictionary defines a structured settlement as "[a] settlement in which the defendant agrees to pay periodic sums to the plaintiff for a specified time." BLACK'S LAW DICTIONARY 1377 (7th ed. 1999). The arrangement contemplated by the Hinger plaintiffs differs as Generali would be expected to provide funds to Larry Ward & Associates which would in turn make (or purchase an annuity to make) periodic payments to the Hinger plaintiffs. The motivation for entering into such an arrangement is not only because of the economics of the transaction, but also because of tax benefits which can arise. *See Western United Life Assur. Co. v. Hayden*, 64 F.3d 833, 839-40 (3d Cir. 1995).

[19] Hawley first became involved in the Hinger suit in November 1993, about one year after judgment was entered in favor of the Hinger plaintiffs. Hawley, acting on behalf of the Excess Carriers, oversaw the appeal of the judgment and eventual $16 million settlement of the Hinger suit.

[20] Hawley's testimony on this point reads in part as follows:
"Q. . . .
What kind of contingent risk is involved in annuities?
A. If the company that the annuity is placed with is unable to meet their obligations, the obligation would back on the placing carrier. In this case it would have been Fireman's Fund, AIG and the London market.
Q. So in other words, if whoever agrees to make these payments in the future to the plaintiffs is unable to make those payments, then the excess insurers in this case would have then been liable to make those future payments?
A. That's correct.
Q. Why do carriers typically seek a discount of at least ten percent in order to assume this risk?

18

plaintiffs' deciding whom the structured settlement would be placed through created a heightened risk of exposure to future liability.

In response, the Excess Carriers state that the possible designation of a portion of the settlement proceeds for the purchase of a structured settlement or annuity did not render the offer conditional. The Excess Carriers also maintain that, when considering whether to accept the offer, Generali was not concerned with any future liability stemming from a structured settlement. In addition, the Excess Carriers contend that Generali's now-stated fear of future liability lacks validity, as the standard practice is for the insured and insurer to receive a release from any future liability in the event the annuity company fails to make the periodic payments. The Excess Carriers claim that the goal of a structured settlement is to reduce the tax liability stemming from a plaintiff's recovery and that section 130 of the Internal Revenue Code, 26 U.S.C. § 130[21], requires a

---

A.    Well, you'll have to forgive me, I am not an expert in structured settlements or annuities. But as it was explained to me by our structured settlement person, was in order to assume–in other words, if we're going to assume the hundred percent of the risk anyway, why buy a structure."

[21]  26 U.S.C. § 130 provided from 1988 through 1996 as follows:

"(a) In general.–Any amount received from agreeing to a qualified assignment shall not be included in gross income to the extent that such amount does not exceed the aggregate cost of any qualified funding assets.
     (b) Treatment of qualified funding asset.–In the case of any qualified funding asset–
          (1) the basis of such asset shall be reduced by the amount excluded from gross income under subsection (a) by reason of the purchase of such asset, and
          (2) any gain recognized on a disposition of such

19

asset shall be treated as ordinary income.

(c) Qualified assignment.–For purposes of this section, the term 'qualified assignment' means any assignment of a liability to make periodic payments as damages (whether by suit or agreement) on account of personal injury or sickness (in a case involving physical injury or physical sickness)—

(1) if the assignee assumes liability from a person who is a party to the suit or agreement, and

(2) if—

(A) such periodic payments are fixed and determinable as to amount and time of payment,

(B) such periodic payments cannot be accelerated, deferred, increased, or decreased by the recipient of such payments,

(C) the assignee's obligation on account of the personal injuries or sickness is no greater than the obligation of the person who assigned the liability, and

(D) such periodic payments are excludable from the gross income of the recipient under section 104(a)(2).

The determination for purposes of this chapter of when the recipient is treated as having received any payment with respect to which there has been a qualified assignment shall be made without regard to any provision of such assignment which grants the recipient rights as a creditor greater than those of a general creditor.

(d) Qualified funding asset.–For purposes of this section, the term 'qualified funding asset' means any annuity contract issued by a company licensed to do business as an insurance company under the laws of any State, or any obligation of the United States, if—

(1) such annuity contract or obligation is used by the assignee to fund periodic payments under any qualified assignment,

(2) the periods of the payments under the annuity contract or obligation are reasonably related to the periodic payments under the qualified assignment, and the amount of any such payment under the contract or obligation does not exceed the periodic payment to which it relates,

(3) such annuity contract or obligation is designated by the taxpayer (in such manner as the Secretary shall by regulations prescribe) as being taken into account under this section with respect to such qualified assignment, and

(4) such annuity contract or obligation is

20

complete release of the parties to the litigation for the tax benefits

to become effective.  As evidence of this supposedly standard practice,

the Excess Carriers refer to the actual settlement reached in the Hinger

suit which includes an annuity in which the Excess Carriers provided

funds to Larry Ward & Associates for periodic payments to the Hinger

plaintiffs and received a release from any future liability.  Therefore,

the Excess Carriers conclude that the Hinger plaintiffs' offer was

unconditional.

Neither Generali nor the Excess Carriers cite any authority that

addresses whether the possibility of structuring some portion of a

settlement renders the offer either conditional or unconditional.  The

---

purchased by the taxpayer not more than 60 days before the date of the qualified assignment and not later than 60 days after the date of such assignment."

From 1989 through 1995, 26 U.S.C. § 104(a)(2) provided as follows:

"§ 104.  Compensation for injuries or sickness

(a) In general.–Except in the case of amounts attributable (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include–

(1) . . .

(2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness;

. . ."

The concluding sentence of § 104(a) provided: "Paragraph (2) shall not apply to any punitive damages in connection with a case not involving physical injury or physical sickness."

21

Texas courts which have considered whether an offer is conditional or unconditional provide little guidance in resolving the issue before this Court. *See Trinity Univ. Ins. Co. v. Bleeker*, 966 S.W.2d 489, 490 (Tex. 1998); *Insurance Corp. of Am. v. Webster*, 906 S.W.2d 77, 80-81 (Tex. App.—Houston[1st] 1995, writ denied); *Jones v. Highway Ins. Underwriters*, 253 S.W.2d 1018, 1022 (Tex. Civ. App.—Galveston 1952, writ ref'd n.r.e.). Under the *Stowers* doctrine, the requirement for an unconditional settlement offer generally refers to a release of the causes of action asserted in the underlying litigation, in this case, the personal injury claims by the Hinger plaintiffs. A settling defendant remains subject to claims to enforce the terms of the settlement reached by the parties. The Excess Carriers argue that Generali's interpretation of the Hinger plaintiffs' offer raises this latter type of future liability, not the former. Even so, the question remains whether the settlement offer was such that its acceptance could expose Generali to being required, under certain conditions, to pay more than its policy limits. A structured settlement, contemplating the purchase of an annuity, may well provide for periodic payments over time totaling more than the original amount used to purchase the annuity, in recognition of the earning value of money. *See, e.g., Hayden*, 64 F.3d at 839-40. If, as here, the cash settlement amount is the policy limits, and a portion of that is used to fund a structured settlement, and if the annuity company defaults and the liability insurer remains liable under the settlement agreement to pay the

22

remaining periodic payments, then the settlement could obligate the liability insurer to pay more than the amount of its policy limits.[22]

Settlement demands, such as the one at issue in this appeal, often are written in outline form and cannot fully encompass all the details of an eventual agreement between the parties. Some level of common practice and understanding necessarily underlies negotiations and demands. The Hinger plaintiffs' offer to "fully settle this case with Defendants" tends to suggest that no potential liability on the part of Generali or the insured would remain upon acceptance of the offer. *See Gunn Infinite, Inc. v. O'Byrne*, 996 S.W.2d 854, 859-60 (Tex. 1999) (determining that the terms "settle" and "settlement" "implicitly if not explicitly required" the release of a party's claims). T h e dispositive issue before the Court remains the meaning of the settlement offer, specifically, whether or not the common understanding of the Hinger plaintiffs' offer includes the release of Generali and the insured from any future liability–not only on all the claims of the plaintiffs arising out of the incident in question but also under the settlement agreement--if Larry Ward & Associates (or the annuity company it selected) became unable to make the periodic payments to the Hinger plaintiffs. Neither Hawley's testimony nor any of the other summary

---

[22] For example, if liability insurance company A's policy limits are $1,000,000 and the plaintiff's settlement offer is for Company A to (1) pay $600,000 in cash to the plaintiff, and (2) pay $400,000 in cash to Company B in return for Company B's promise to pay plaintiff $87,000 a year for the next five years, and (3) guarantee Company B's obligation to plaintiff, then acceptance of the settlement offer may obligate Company A to payment of more than its policy limits.

judgment evidence resolves this issue. Hawley did not testify to the common practice and understanding of structured settlement provisions and, in fact, admitted that he was not an expert in the field of structured settlements and was essentially merely repeating what had been "explained to me by our structured settlement person." Therefore, his statements cannot be determinative. As noted previously, the Hinger plaintiffs settled with several defendants before trial. Each offer contained a provision for structuring some portion of the settlement through Larry Ward & Associates; the record, however, does not indicate whether the settling defendants received a release from future liability associated with the structured settlement. However, the $16 million settlement reached after the appeal to the New Mexico court of appeals does contain such a release.[23] There is simply no evidence in the record sufficient to establish that reasonable attorneys and adjusters would regard the Hinger plaintiffs' offer as calling for an arrangement under which Generali would retain contingent liability for the periodic payments to be made by an annuity company under a structured settlement or as being reasonably susceptible to being properly so interpreted.

In addition, when considering whether to accept the Hinger plaintiffs' offer, Reynaud was not concerned with any future liability stemming from the structured settlement provision. Generali's position

---

[23] The correspondence between the Hinger plaintiffs and their counsel, Roehl, refers to the tax advantages of the structured settlements, implying that they conform to section 130 of the Internal Revenue Code. In his deposition testimony, Roehl reiterates the tax advantages of the structured settlements.

in this litigation that the offer was conditional gives the impression of being a post-hoc rationalization. There is no evidence whatever that Reynaud or anyone else on behalf of Generali ever concluded (or was advised)–certainly not prior to the institution of this suit by the Excess Carriers–that the settlement offer might be so construed as to authorize imposition of liability on Generali in the event the annuity company defaulted in the periodic payments to the Hinger plaintiffs that presumably would be called for under a structured settlement. And it is also absolutely clear that neither Reynaud nor anyone else on behalf of Generali ever raised any question, or requested any clarification, in this respect with the Hinger plaintiffs or anyone else. *Cf. Martin v. Xarin Real Estate, Inc.*, 703 F.2d 883, 887-88 (5th Cir. 1983) (refusing to consider payment by personal check instead of cash as a basis for defeating the formation of contract where the receiver acquiesced to the form of payment).

In conclusion, on the present record Generali's contention that the offer was conditional has not been established as a matter of law and, therefore, cannot be a basis for affirming the district court's judgment.

IV   Consent by Parker & Parsley as a Defense

Generali also asserts that the Excess Carriers' *Stowers* claim is barred, because the insured, Parker & Parsley and Evergreen Resources, did not demand that the November 10, 1992 offer by the Hinger plaintiffs be accepted and, in fact, desired that the Hinger suit be tried to

verdict. In response, the Excess Carriers argue that Texas law has not recognized this defense to a *Stowers* action and that, even if it does, the evidence does not establish the affirmative defense of consent as a matter of law. Under the doctrine of equitable subrogation, the Excess Carriers stand in the shoes of the insured, Parker & Parsley, and "are subject to any defenses assertable against [the] insured, including the refusal to settle and the failure to cooperate." *American Centennial Ins. Co.*, 843 S.W.2d at 483.

Generali cites *Certain Underwriters of Lloyd's v. General Accident Insurance Co. of America*, 909 F.2d 228 (7th Cir. 1990), and *Insurance Co. of North America v. Medical Protective Co.*, 768 F.2d 315 (10th Cir. 1985), in support of its contention that consent bars the Excess Carriers' *Stowers* claim. These cases, which apply Indiana law and Kansas law, respectively, do recognize consent by an insured as a defense to a suit by an excess carrier against a primary carrier for the wrongful failure to settle an underlying action within the primary policy limits. However, Generali has not cited, nor has our independent research uncovered, any case recognizing consent as a defense under Texas law to a *Stowers* claim.[24] Moreover, in *Insurance Co. of North*

---

[24] One Texas court of appeals has held that the duty to accept reasonable offers under the *Stowers* doctrine exists without the insured demanding that the offer be accepted. *See Highway Ins. Underwriters v. Lufkin–Beaumont Motor Coaches*, 215 S.W.2d 904, 929 (Tex. Civ. App.–Beaumont 1948, writ ref'd n.r.e.) ("It was not a defense to Insurer that Insured did not demand acceptance of Alexander's offers. Insurer must perform the duty imposed upon it without being activated by Insured."). Although this opinion casts some doubt on consent being a

*America*, the policy at issue covered medical malpractice and stated "that the 'company shall not compromise any claim hereunder without the consent of the insured.'" *Id*. at 319. In contrast, Generali's primary policy does not contain such a provision and, in fact, states that Generali "may make such investigation and settlement of any claim or suit as it deems expedient." In addition, Parker & Parsley's in-house attorney supervising the Hinger suit, William Dingler (Dingler), testified that he did not feel certain that he had the authority to veto a settlement offer by Generali and that Generali, through Reynaud,

---

defense to a *Stowers* claim, it does not preclude the existence of the defense asserted by Generali.

The Texas Supreme Court's recent decision, *Keck, Mahin & Cate v. National Union Fire Insurance Co. of Pittsburgh*, ___ S.W.3d ____, 2000 WL 674756 (Tex. May 25, 2000), sheds little light on the validity of consent as a defense to a *Stowers* claim. In *Keck*, the Texas Supreme Court considered whether an insured's written release of malpractice claims against its attorneys precluded an excess insurance carrier's malpractice claim against the attorneys, which alleged errors on the part of the attorneys in handling the defense of an underlying action against the insured. The court "assume[d], without deciding, that [the insured]'s agreement with [its attorneys] could affect [the excess carrier's] and [the primary carrier's] respective rights against [the attorneys] because neither insurance carrier argues differently in this Court." *Id*. at n.2. After concluding that the release did not bar certain elements of the excess carrier's malpractice action, the court then held that the "present summary judgment evidence" did not establish the validity of the release, because the attorneys (who as fiduciaries carried the burden of proving that the release agreement was fair and reasonable) did not show "the state of [the insured]'s information or that the agreement was fair and reasonable." *Id*. at *5. In *Keck*, the court also considered a primary carrier asserting the affirmative defense of contributory negligence on the part of the excess carrier and the limitations on this defense. *See id*. at *6-10. Although Generali pleaded contributory negligence in its answer, it did not raise contributory negligence in its motion for summary judgment before the district court. Accordingly, we need not address the Texas Supreme Court's treatment of that subject in *Keck*.

27

determined how to proceed in settlement and mediation processes of the Hinger suit. Although Generali raised the defense of consent as a basis for its summary judgment motion, the district court did not pass on the issue. Assuming *arguendo* that consent is a valid defense to a *Stowers* action, we conclude that Generali has not established its entitlement to summary judgment on this defense.

Under Texas law, consent is an affirmative defense, and Generali bears the burden of establishing it at trial. *See Conoco, Inc. v. Amarillo Nat'l Bank*, 996 S.W.2d 853, 853 (Tex. 1999) (*per curiam*); *see also General Mills Restaurants, Inc. v. Texas Wings, Inc.*, 12 S.W.3d 827, 835 (Tex. App.–Dallas 2000, no pet. h.); *State Bar of Texas v. Dolenz*, 3 S.W.3d 260, 268 (Tex. App.–Dallas 1999, no pet. h.). Such consent would have to be predicated on the insured being adequately informed of settlement negotiations and trial proceedings and on an unequivocal decision by the insured to refuse the offer. *See Certain Underwriters of Lloyd's*, 909 F.2d at 233-34; *Insurance Co. of N. Am.*, 768 F.2d at 319-20. Generali has not established either.

First, the evidence does not suffice to establish, as a matter of law, that Dingler was fully informed of the settlement offer and the trial strategy. In his deposition testimony, Dingler stated that, although he was aware of the Hinger plaintiffs' November 10th offer, he was *not* notified of Logan's recommendation that the offer be accepted. In the absence of knowing that the lead trial counsel's opinion was that the settlement offer should be accepted, an insured cannot be said to

28

have been fully informed such that the defense of consent is established as a matter of law. *See Keck, Mahin & Cate*, ___ S.W.3d at ___ (finding summary judgment inappropriate where the party with the burden of proving the validity of a release failed to establish the state of information known by the purported releasing party). Second, the evidence does not unequivocally indicate that Parker & Parsley refused the offer. Admittedly, Dingler did testify that Parker & Parsley's general counsel, Mark Withrow, stated that he had no reason to settle the Hinger suit. On the other hand, Dingler also testified that he would have gone along with a decision by Generali to settle the Hinger suit and that he did not consider himself as having the authority to veto such a decision. Moreover, Dingler considered Reynaud as being responsible for making decisions during the mediation conference of the Hinger suit, and Reynaud did not consult Dingler, or anyone else at Parker & Parsley, either when he rejected the Hinger plaintiffs' offer or when he offered to settle the Hinger suit for $110,000 on November 13. On this record, even if the insured's consent is a defense to a *Stowers* action under Texas law, the evidence, when viewed in the light most favorable to the Excess Carriers, does not rise to the level necessary for consent to be established as a matter of law.

## Conclusion

For the reasons stated, we reverse the district court's grant of summary judgment in favor of Generali and remand the cause for further proceedings not inconsistent herewith.

REVERSED and REMANDED.